UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ X

    JOHNNY MORGAN,

                          Plaintiff,

            -against-

KIMBERLY SHIVERS (Operations Lieutenant),
RASHEE GRAHAM (Senior Officer),
CHRISTOPHER MERRICK (Senior Officer),
KEITH HARDY (Activities Lieutenant),
JABRADDRICK DURRANT (Corrections
Officer), GREGORY ADAMS (Corrections
Officer), Mr. WILLIAM FELICIANO (SHU
Officer), and THE UNITED STATES OF
AMERICA,

                          Defendants.

------------------------------------------------------------ X

1:14-cv-7921-GHW

<u>MEMORANDUM OPINION
AND ORDER</u>

GREGORY H. WOODS, United States District Judge:

## I. INTRODUCTION

In February 2014, *pro se* Plaintiff Johnny Morgan was a pre-trial detainee at the Federal

Metropolitan Correctional Center ("MCC") in New York. Following social contact visits in the

prison, inmates were required to submit to a visual search. During one such search, prison officials

located contraband in one of Mr. Morgan's body cavities. According to Mr. Morgan, the prison

officials conducted an unreasonable search and forcibly removed the contraband from his body,

causing him pain. Mr. Morgan brings a number of constitutional claims pursuant to *Bivens v. Six

Unknown Named Agents*, as well as claims under the Federal Tort Claims Act ("FTCA").

Mr. Morgan's FTCA claims related to the search at issue here will be decided at trial; Defendants

move for summary judgment only as to Mr. Morgan's *Bivens* claims, as well as his FTCA claim to the

extent it is premised on a violation of Bureau of Prisons ("BOP") policy. Because it is not

appropriate to imply a damages remedy for the constitutional claims raised by Mr. Morgan, Defendants' motion for partial summary judgment is GRANTED.

## II.    FACTUAL BACKGROUND[1]

Plaintiff Johnny Morgan was incarcerated at the BOP's MCC in New York, New York from March 5, 2012 until April 15, 2013, and again from October 1, 2013 until March 26, 2015.  Dkt. No. 212, Defendants' Statement of Material Undisputed Facts Pursuant to Local Rule 56.1 ("Defs.' 56.1") ¶ 1.  While at the MCC, Mr. Morgan had visits with friends and family.  *Id.* ¶ 2.  Pursuant to BOP policy, upon the conclusion of social contact visits, inmates are required to submit to a visual search by a correctional officer.  *Id.* ¶¶ 3-4.  Such searches generally involved the inmate removing his clothes, and complying with various verbal orders that would facilitate the correctional officer's search for contraband.  *Id.* ¶¶ 5-6.

On February 10, 2014, Mr. Morgan participated in a social visit.  *Id.* ¶ 7.  During the visit, he was given a "big," "fat" piece of contraband that consisted of tobacco and K2, wrapped in plastic, which he attempted to secret in his anal cavity.  *Id.* ¶¶ 8-9; Declaration of Natasha Teleanu ("Teleanu Decl."), Ex. A ("Morgan Dep. Tr.") at 52:4-15, 53:17-54:16, 64:20-21.  Mr. Morgan admits that the contraband was only pushed half-way into his anal cavity.  Defs.' 56.1 ¶ 9.  Following this social visit, at around 6:30 p.m., MCC correctional officer Rashee Graham started to conduct the required visual search of Mr. Morgan.  *Id.* ¶ 11; Morgan Dep. Tr. at 72:4-74:10, 78:10-78:21. During the search, following two orders to squat and cough and an order directing Mr. Morgan to spread his butt cheeks, Officer Graham saw the contraband.  Defs.' 56.1 ¶¶ 12-14.  Officer Graham ordered Mr. Morgan to turn the contraband over, but Mr. Morgan refused to do so.  *Id.* ¶ 15.

---

[1] The following facts are drawn from the Defendants' Local Civil Rule 56.1 Statement and Plaintiff's response in opposition.  The Court cites to Defendants' 56.1 statement, but only does so to the extent the fact is undisputed.  The citation to the Defendants' statement therefore incorporates Mr. Morgan's response.  *See* Dkt. Nos. 229 & 242.

Officer Graham then radioed for assistance from other prison officers, and while he did so, Mr. Morgan attempted to push the contraband further inside him. *Id.* ¶ 17; Morgan Dep. Tr. at 94:2-16. *Id.* Eventually Lieutenant Keith Hardy responded to Officer Graham's request for assistance and came to the search room. *Id.* ¶ 18. What happened next is in dispute. Mr. Morgan contends that that the contraband was forcibly removed from his anal cavity by Officer Graham, causing Mr. Morgan pain. *Id.* ¶ 19; Morgan Dep. Tr. at 135:6-7 ("Once he pulled [the contraband] from out of me I observed it from his hand."). According to a BOP report concerning the incident, the officers involved aver that no force was used in removing the bag from Mr. Morgan's rectum. Dkt. No. 221, Declaration of Anthony Pedone, Ex. A (Special Investigative Agent Investigative Report at 2-3).

Pursuant to BOP procedure, when officers suspect an inmate is secreting contraband, that inmate is escorted to a "dry cell" in order for officers to observe the inmate's bowel movements to ensure that the inmate is not hiding additional contraband. Defs.' 56.1 ¶ 21. After the contraband was retrieved, Mr. Morgan was therefore handcuffed and escorted to a dry cell in the special housing unit. *Id.* ¶ 20. On his way to the dry cell, and again after some time in the dry cell, Mr. Morgan asked Lieutenant Hardy and one other officer to be taken to the medical department because he was in pain, and had observed blood on the contraband and on his underwear. Defs.' 56.1 ¶¶ 43-44. Mr. Morgan asked "nobody else" besides these two officers about receiving medical treatment. Morgan Dep. Tr. at 148:1-5. While in the dry cell, Mr. Morgan used tissues to wipe around his anal cavity, saw blood on the tissues after doing so, and showed officers the tissues. *Id.* at 150:6-17. Mr. Morgan testified that he eventually fell asleep in the dry cell, and that when he woke up, "by then the bleeding I think kind of slowed down, so I just left it like that. And then they took me [to get medical treatment] the next day." *Id.* at 151:4-10.

Less than twenty-four hours after the search, at around 1:00 p.m. on February 11, 2014, the

MCC Chief Psychologist, Dr. Elissa Miller evaluated Mr. Morgan's condition. *See* Dkt. No. 217, Declaration of Elissa R. Miller, Psy.D ("Miller Decl."), Ex. A (February 11, 2014 Sexual Abuse Intervention Contact Note) ("The Chief Psychologist was contacted by the [Prison Rape Elimination Act ("PREA")] Coordinator. . . . According to the [PREA Coordinator], Inmate Morgan reported he was 'violated' during a visual search. . . . Inmate Morgan was immediately interviewed at 1:00 p.m."). The psychologist reported that Mr. Morgan told her that the search caused him pain, and that he continued to wipe blood from his anus as a result of the search. Defs.' 56.1 ¶ 49. Dr. Miller responded to Mr. Morgan's complaints by directing a "complete medical evaluation" by the Health Services Department, and further referring him to the special investigation unit for further investigation of the incident. Miller Decl., Ex. A at 1.

Later that day, at around 3:45 p.m., Mr. Morgan received the directed medical evaluation when BOP mid-level medical practitioner Erwin Ramos performed an injury assessment. Defs.' 56.1 ¶¶ 51, 53. Mr. Ramos noted "no rectal/anal tears" and "no bleeding[,] redness, or swelling" during this exam. *Id.* ¶¶ 54-55, *see also* Dkt. No. 218, Declaration of Erwin Ramos ("Ramos Decl."), Ex. A (February 11, 2014 Health Services Clinic Encounter Report). In the two months following the February 10, 2014 incident, including twice within one week of the search, Mr. Morgan was seen by other BOP and independent medical practitioners on a number of occasions. Defs.' 56.1 ¶ 56. Specifically, Mr. Morgan was seen by Dr. Miller on February 12, February 20, and March 13; by a BOP mid-level practitioner on February 15; by an outside clinic on February 28, by a BOP psychiatrist on March 24; and by a BOP physician on March 25. *See* Miller Decl. ¶¶ 5-7, 9 & Exs. B, C, and D; Dkt. No. 219, Declaration of Robert Beaudoin, M.D. ("Beaudouin Decl.") ¶¶ 9-14 & Exs. B, C, D, and E.

Although Mr. Morgan testified that he is not aware of any internal damage to his anal cavity, Morgan Dep. Tr. at 164:3-5, in opposing summary judgment, he maintains that he "continues to

4

bleed from his rectum" and "continues to believe that he sustained damage at the time of the incident," Dkt. No. 242, Plaintiff's Corrected Response In Opposition To Defendants['] Statement of Material Undisputed Facts, ¶¶ 54-55.

## III.    PROCEDURAL HISTORY

Mr. Morgan filed his initial complaint on September 29, 2014, and amended his complaint multiple times. Defendants filed their motion for partial summary judgment on May 17, 2017, arguing that Plaintiff failed to timely exhaust his administrative remedies under the Prison Litigation Reform Act ("PLRA"), that certain Individual Defendants had no personal involvement with the alleged constitutional violations at issue, that any delay in medical treatment was not sufficiently serious to support liability, and that a violation of BOP policy is not actionable under the FTCA. Dkt. No. 222 ("Defs.' Mot."). Plaintiff opposed Defendants' motion on July 6, 2017. Dkt. No. 230 ("Pl.'s Oppn").

Following the filing of Plaintiff's opposition, Defendants requested leave to file an extended reply in support of their motion for summary judgment in order to address the applicability of the recent Supreme Court decision in *Ziglar v. Abbasi*, 137 S.Ct. 1843 (2017). The Court granted Defendants' request, and Defendants filed their reply brief on July 21, 2017. Dkt. No. 234 ("Defs.' Reply"). Mr. Morgan filed a sur-reply on August 10, 2017 to address the Defendants' additional arguments. Dkt. No. 244 ("Pls.' Sur-Reply").

## IV.    LEGAL STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) ("[S]ummary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving

party is entitled to a judgment as a matter of law.'" (quoting former Fed. R. Civ. P. 56(c))).

The party moving for summary judgment must first demonstrate the absence of any genuine dispute of material fact. *Nick's Garage, Inc. v. Progressive Cas. Ins. Co.*, 875 F.3d 107, 114 (2d Cir. 2017) (citing *Celotex*, 477 U.S. at 323). If the burden of proof at trial would fall on the movant, that party's "own submissions in support of the motion must entitle it to judgment as a matter of law." *Albee Tomato, Inc. v. A.B. Shalom Produce Corp.*, 155 F.3d 612, 618 (2d Cir. 1998). If, on the other hand, "the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim." *Simsbury-Avon Preservation Soc'y v. Metacon Gun Club, Inc.*, 575 F.3d 199, 204 (2d Cir. 2009) (citing *Celotex Corp.*, 477 U.S. at 322-23).

If the moving party meets its burden, the nonmoving party "must come forward with 'specific facts showing that there is a genuine issue for trial'" in order to avoid summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting former Fed. R. Civ. P. 56(e)). "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252. Moreover, the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita*, 475 U.S. at 586, and he "may not rely on conclusory allegations or unsubstantiated speculation," *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001) (internal quotation marks and citation omitted).

A genuine dispute exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," while a fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* In determining whether there exists a genuine dispute as to a material fact, the Court is "required to resolve all ambiguities and draw all

permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (internal quotation marks and citation omitted). The Court's job is not to "weigh the evidence or resolve issues of fact." *Lucente v. Int'l Bus. Machs. Corp.*, 310 F.3d 243, 254 (2d Cir. 2002). "Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." *Jeffreys v. City of New York*, 426 F.3d 549, 553-54 (2d Cir. 2005) (citation omitted).

When the plaintiff is proceeding *pro se,* as Mr. Morgan is here, the Court is obliged to construe the plaintiff's submissions with "special solicitude" and interpret them "to raise the strongest arguments that they *suggest.*" *Roman v. Donelli,* 347 F. App'x 662, 663 (2d Cir. 2009) (summary order) (emphasis in original) (quoting *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 474-75 (2d Cir. 2006)).

## V. DISCUSSION

### A. The Legal Framework for *Bivens* Claims

In 1971, in *Bivens v. Six Unknown Named Agents*, 403 U.S. 388, the Supreme Court held that a plaintiff had an implied private right of action for damages against federal officers who violated the plaintiff's Fourth Amendment rights against unreasonable search and seizure when they handcuffed him inside his home without a warrant. In the more than forty years since that decision, the Supreme Court has created a new implied right of action in only two other cases: (1) under the Fifth Amendment's due process clause for gender discrimination arising out of a Congressman's firing of his female secretary, *Davis v. Passman*, 442 U.S. 228 (1979), and (2) under the Eighth Amendment's cruel and unusual punishment clause arising out of prison officials' failure to treat an prisoner's asthma, which resulted in the prisoner's death, *Carlson v. Green*, 446 U.S. 14 (1980).

In a recent decision, the Supreme Court underscored that "expanding the *Bivens* remedy is now a 'disfavored' judicial activity." *Ziglar v. Abbasi*, 137 S.Ct. 1843, 1857 (2017) (citing *Ashcroft v.*

*Iqbal*, 556 U.S. 662, 675 (2009)). That is because "[w]hen an issue involves a host of considerations that must be weighed and appraised, it should be committed to those who write the laws rather than those who interpret them." *Id.* at 1857 (citing *Bush v. Lucas*, 462 U.S. 367, 380 (1983)) (internal quotation marks omitted). In *Ziglar*, the Court re-emphasized that the creation of a new private right of action under *Bivens* must be carefully scrutinized.

As the Supreme Court has instructed, this careful scrutiny requires courts to engage in a process to determine whether it is appropriate for the Judiciary to extend a *Bivens* remedy to the claims of a particular case. A court must first determine whether the claim "presents a new *Bivens* context." *Id.* at 1859. A new *Bivens* context will exist "[i]f the case is different in a meaningful way from previous *Bivens* cases decided by this Court." *Id.* The Court presented a non-exhaustive list of considerations to examine if a case is meaningfully different, including:

> "[T]he rank of the officers involved; the constitutional right at issue; the generality or specificity of the official action; the extent of judicial guidance as to how an officer should respond to the problem or emergency to be confronted; the statutory or other legal mandate under which the officer was operating; the risk or disruptive intrusion by the Judiciary into the functioning of other branches; or the presence of potential special factors that previous *Bivens* cases did not consider."

*Id.* at 1860.

If the court determines that the claim at issue differs meaningfully from previous *Bivens* cases, the court must then determine if it is appropriate to imply a new private right of action to that claim. In *Ziglar,* the Supreme Court affirmed the long-held precedent that a *Bivens* remedy "will not be available if there are 'special factors counselling hesitation in the absence of affirmative action by Congress.'" *Id.* at 1857 (citing *Carlson,* 446 U.S. at 18). The Court explained that the "special factors" inquiry "must concentrate on whether the Judiciary is well suited, absent congressional action or instruction, to consider and weigh the costs and benefits of allowing a damages action to proceed. Thus, to be a 'special factor counselling hesitation,' a factor must cause a court to hesitate before answering that question in the affirmative." *Id.* at 1857-58. That is, a court begins with the

premise that the Judiciary should not readily extend a *Bivens* remedy to new claims, and before a court does so, it should consider a number of factors to determine whether "Congress would want the Judiciary to entertain a damages suit in a given case." *Id.* Among those factors is whether alternative remedies exist for addressing the constitutional violations raised by the claims of a particular case. The Supreme Court held that "if there is an alternative remedial structure present in a certain case, that alone may limit the power of the Judiciary to infer a new *Bivens* cause of action." *Id.*

Defendants have moved to dismiss several of the *Bivens* claims that Mr. Morgan's submissions can be construed to raise, contending that these claims differ meaningfully from previous *Bivens* cases, and that there are special factors counselling hesitation in extending a *Bivens* remedy to those claims. In particular, Defendants move to dismiss Plaintiff's (1) Fourth Amendment search and seizure claim; (2) Fifth Amendment excessive force claim; and (3) Fifth Amendment sexual assault claim.[2,3]

### B. Mr. Morgan's Claims Are Meaningfully Different from Prior *Bivens* Cases, and Special Factors Counsel Hesitation In Extending A *Bivens* Remedy Here

Each of Mr. Morgan's claims present new *Bivens* contexts. Mr. Morgan's Fourth Amendment claim differs meaningfully from the Fourth Amendment claim in *Bivens* because his claim arises out of allegations concerning a routine search for contraband, not a warrantless seizure of a person. In addition, the body cavity search was conducted by correctional officers, not narcotics agents. Importantly, the search took place in a prison. This difference is meaningful because the Supreme Court has long distinguished its analysis of the Fourth Amendment when

---

[2] As Defendants correctly note, and as Plaintiff concedes, because Plaintiff was a pre-trial detainee at the time of the search at issue in this case, his claims arise under the Fifth Amendment, not the Eighth. *See* Defs.' Reply at 14 n.4; Pl.'s Sur-Reply at 8-9; *see also Cuoco v. Moritsugu*, 222 F.3d 99, 106 (2d. Cir. 2000).

[3] Defendants do not move to dismiss Plaintiff's Fifth Amendment deliberate indifference claim using the special factors analysis reiterated by the Supreme Court in *Ziglar*. That claim is addressed separately below.

raised in the context of a prison facility. In doing so, it has emphasized that "[a] detention facility is a unique place fraught with serious security dangers," and therefore that an inmate's privacy interests must be balanced against the "significant and legitimate security interests of the institution." *Bell v. Wolfish*, 441 U.S. 520, 559-60 (1979). Mr. Morgan's Fourth Amendment search and seizure claim is therefore meaningfully different from the Fourth Amendment claim in *Bivens*, and thus presents a new *Bivens* context. *Ziglar*, 137 S.Ct. at 1860.

Similarly, although *Davis* concerned the Fifth Amendment, Mr. Morgan's Fifth Amendment excessive force and sexual assault claims are meaningfully different from gender discrimination claim raised in *Davis*. That claim concerned an employment action, not a physical search in the prison context. Mr. Morgan's Fifth Amendment claims also present a different context than the claims in *Carlson,* as that case concerned the cruel and unusual punishment clause of the Eighth Amendment as it related to a failure to provide medical treatment, while Mr. Morgan's claims relate to a search for contraband and arise under the Fifth Amendment. *See Ziglar*, 137 S.Ct. at 1864 ("The constitutional right is different here, since *Carlson* was predicated on the Eight Amendment and this claim is predicated on the Fifth."). Furthermore, the allegation that BOP officials forcibly removed contraband from Mr. Morgan's anal cavity is significantly different from the claims in *Carlson* concerning prison officials' indifference to a prisoner's medical need. Plaintiff's Fifth Amendment claims for excessive force and sexual assault therefore implicate a new context for the application of a *Bivens* remedy.

As the Supreme Court reiterated in *Ziglar,* once a court determines that a plaintiff's claim presents a new *Bivens* context, the court must then analyze whether "special factors counsel[] hesitation" in expanding *Bivens* "in the absence of affirmative action by Congress." *Id.* at 1857 (citing *Carlson*, 446 U.S. at 18). Here, the Court concludes that there are a number of special factors that caution against extending a *Bivens* remedy to Mr. Morgan's Fourth and Fifth Amendment claims

relating to his body cavity search. First, "when alternative methods of relief are available, a *Bivens* remedy usually is not." *Id.* at 1863. Contrary to Mr. Morgan's assertion, this is not a case in which the only remedy would be the court-created implied right of action—that is, it is not "damages or nothing." *Bivens*, 403 U.S. at 410. Importantly, Plaintiff had an alternative remedy for his claim that the body cavity search violated his constitutional rights—the FTCA. The FTCA provides for money damages for claims "arising . . . out of assault, battery," and other torts with regard to acts or omissions of officers of the U.S. Government. 28 U.S.C. § 2680(h). Mr. Morgan is pursuing this remedy; his FTCA claim is not challenged in Defendants' motion for summary judgment, and will proceed to trial.

Although the Supreme Court considered the existence of the FTCA remedy in *Carlson*, and nevertheless created an implied private right of action in that case, the Supreme Court's recent decision in *Ziglar* indicates that hesitation is nevertheless appropriate today. In emphasizing that "expanding the *Bivens* remedy is now considered a 'disfavored' judicial activity," the Supreme Court observed that its conclusion in *Carlson* "might have been different if [it] were decided today." *Ziglar*, 137 S. Ct. at 1856-57 (noting that "the Court has refused to [extend *Bivens* to any new context] for the past 30 years"). Therefore, despite the fact that previously, the FTCA and *Bivens* were considered "parallel, complementary causes of action," *Carlson*, 446 U.S. at 20, the Court believes that, in light of the Supreme Court's recent decision in *Ziglar*, the existence of the alternative remedial structure is nevertheless a factor counselling hesitation in extending an implied damages remedy to Mr. Morgan's claims.

While the existence of an alternative remedial structure alone may be sufficient to counsel against the creation of a judicial remedy in this case, the fact that Mr. Morgan's claims arise in the prison context also counsels hesitation. The Supreme Court has opined on factual circumstances very similar to those raised in Mr. Morgan's lawsuit, and has instructed courts to give deference to

prison officials in preventing the smuggling of contraband into prison facilities. In *Bell v. Wolfish*, the Court recognized that the "[s]muggling of money, drugs, weapons, and other contraband is all too common an occurrence" in detention facilities, "[a]nd inmate attempts to secrete these items into the facility by concealing them in body cavities are documented in this record, and in other cases." 441 U.S. at 559. In holding that visual body cavity searches were not per se Fourth Amendment violations, the Court explained that "the problems that arise in the day-to-day operation of a corrections facility are not susceptible of easy solutions. Prison administrators therefore should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Id.* at 547.

This is particularly true for the policies and practices concerning prison officials' searches for contraband; the Supreme Court has "recognized that deterring the possession of contraband depends in part on the ability to conduct searches without predictable exceptions." *Florence v. Bd. of Chosen Freeholders of Cnty. of Burlington*, 566 U.S. 318, 327-28 (2012). The creation of a damages remedy here could have the negative consequence of deterring prison officials from engaging in such searches. Fundamentally, Mr. Morgan's claims present a plethora of policy-related considerations that would require the Court to balance the challenges prison administrators and officers face in maintaining prison security against the expansion of private right of action for damages. This task is more appropriately suited for Congress, not the Judiciary. *See Bell*, 441 U.S. at 548 ("But judicial deference is accorded not merely because the [prison] administrator ordinarily will, as a matter of fact in a particular case, have a better grasp of his domain than the reviewing judge, but also because the operation of our correctional facilities is peculiarly the province of the Legislative and Executive Branches of our Government, not the Judicial."). The Supreme Court's acknowledgment that searches for contraband in prisons present issues that warrant judicial

deference to prison officials is another factor counseling hesitation in extending *Bivens* to Mr. Morgan's claims concerning the body cavity search.

Furthermore, Congress has legislated in the arena of prisoner rights, suggesting that the courts should not extend a damages remedy in this sphere. As the Supreme Court explained in *Ziglar,* "legislative action suggesting that Congress does not want a damages remedy is itself a factor counseling hesitation." 137 S.Ct. at 1865. One such example of legislative action relevant to the claims raised in this case is the Prison Litigation Reform Act ("PLRA"). As the Court in *Ziglar* explained,

> Some 15 years after *Carlson* was decided, Congress passed the Prison Litigation Reform Act of 1995, which made comprehensive changes to the way prisoner abuse claims must be brought in federal court. So it seems clear that Congress had specific occasion to consider the matter of prisoner abuse and to consider the proper way to remedy those wrongs . . . [T]he Act itself does not provide for a standalone damages remedy against federal jailers. It could be argued that this suggests Congress chose not to extend the *Carlson* damages remedy to cases involving other types of prisoner mistreatment.

*Id.* at 1865. The PLRA covers Plaintiff's claims here: "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002). This statutory scheme further causes the Court to hesitate in extending an implied damages remedy here.

In addition to the PLRA, in 2003, Congress enacted the Prison Rape Elimination Act ("PREA"). 34 U.S.C.A § 30301. The PREA was enacted to, among other things, "protect the Eighth Amendment rights of Federal, State, and local prisoners," 34 U.S.C. § 30302(7), in light of the Congressional finding that "[t]he high incidence of sexual assault within prisons involves actual and potential violations of the United States Constitution," 34 U.S.C. § 30301(13). This statutory scheme has not, however, been interpreted to establish a private cause of action for allegations of prison rape. *See Amaker v. Fischer*, No. 10-CV-0977A, 2014 WL 4772202, at *14 (W.D.N.Y. Sept. 24,

2014) (collecting cases), *order superseded,* No. 10-CV-0977, 2015 WL 1822541 (W.D.N.Y. Apr. 22, 2015). This further suggests that, when Congress had the "specific occasion to consider the matter" of prison sexual assault, "and to consider the proper way to remedy those wrongs," it did not find the creation of a remedy for individuals appropriate. *Ziglar*, 137 S.Ct. at 1865. Congressional action in this area suggests that the Judiciary should hesitate before creating a remedy in this case.

Because there are numerous special factors counseling hesitation in extending *Bivens* to the factual circumstances of this case, the Court declines to do so. Defendants are therefore entitled to summary judgment on Mr. Morgan's Fourth Amendment search and seizure claim and his Fifth Amendment claims for excessive force and sexual assault.

### C. Mr. Morgan's Deliberate Indifference Claim Fails

Defendants do not move to dismiss Mr. Morgan's Fifth Amendment deliberate indifference claim based upon the analysis reiterated by the Supreme Court's decision in *Ziglar*.[4] Instead, Defendants contend that Mr. Morgan has not established the elements of a claim for deliberate indifference to medical needs. The Court agrees. Specifically, the record does not support a finding of a sufficiently serious delay or harm.

A claim of deliberate indifference to serious medical needs has typically been analyzed under a two-pronged standard. "The first requirement is objective: 'the alleged deprivation of adequate medical care must be 'sufficiently serious.'" *Spavone v. New York State Dep't of Correctional Servs.*, 719 F.3d 127, 138 (2d Cir. 2013) (quoting *Salahuddin v. Goord*, 467 F.3d 263, 279 (2d Cir. 2006)). The second requirement is that the charged officials must be "reckless in their denial of medical care." *Id.* As the Second Circuit has explained this two-prong standard as it applies to pre-trial detainees

---

[4] The Court notes that, even in light of the proscription against creating new *Bivens* remedies, it would be counterintuitive if a convicted prisoner could remedy a federal officer's failure to provide medical care amounting to punishment, but a pre-trial detainee—who, "unlike convicted prisoners[,] cannot be punished at all," could not. *Kingsley v. Hendrickson*, 135 S.Ct. 2466, 2475 (2015).

like Plaintiff, the second requirement—the "*mens rea* prong" of deliberate indifference to serious

medical needs claims—must be analyzed objectively: courts must determine whether the official

"knew, or should have known" that his or her conduct "posed an excessive risk to health or safety."

*Darnell v. Pineiro*, 849 F.3d 17, 32, 35 (2d Cir. 2017). Here, the Court need not reach the second

prong of this standard, because there are no facts in the record to support a finding that the alleged

deprivation was sufficiently serious.

To meet the first prong of the deliberate indifference standard, "the alleged deprivation

must be sufficiently serious, in the sense that a condition of urgency, one that may produce death,

degeneration, or extreme pain exists." *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996). As the

Second Circuit explained,

> [d]etermining whether a deprivation is an objectively serious deprivation entails two
> inquiries. The first inquiry is whether the prisoner was actually deprived of adequate medical
> care. As the Supreme Court has noted, the prison official's duty is only to provide
> reasonable care. Thus, prison officials who act reasonably in response to an inmate-health
> risk cannot be found liable under the Cruel and Unusual Punishments Clause, and,
> conversely, failing to take reasonable measures in response to a medical condition can lead to
> liability. Second, the objective test asks whether the inadequacy in medical care is sufficiently
> serious. This inquiry requires the court to examine how the offending conduct is inadequate
> and what harm, if any, the inadequacy has caused or will likely cause the prisoner. For
> example, if the unreasonable medical care is a failure to provide any treatment for an
> inmate's medical condition, courts examine whether the inmate's medical condition is
> sufficiently serious. Factors relevant to the seriousness of a medical condition include
> whether a reasonable doctor or patient would find it important and worthy of comment,
> whether the condition significantly affects an individual's daily activities, and whether it
> causes chronic and substantial pain.

*Salahuddin v. Goord*, 467 F.3d at 279-80 (internal citations and quotation marks omitted).

In cases such as this one, where some treatment was given but the plaintiff alleges that that

treatment was inadequate, "the seriousness inquiry focus[es] on the challenged delay or interruption

in treatment rather than the prisoner's underlying medical condition alone." *Id.* at 280 (quoting

*Smith v. Carpenter,* 316 F.3d 178, 185 (2d Cir. 2003) (internal quotation marks omitted)). "Where

temporary delays or interruptions in the provision of medical treatment have been found to satisfy

the objective seriousness requirement in this Circuit, they have involved either a needlessly prolonged period of delay, or a delay which caused extreme pain or exacerbated a serious illness." *Ferguson v. Cai*, No. 11-cv-6181, 2012 WL 2865474, at *4 (S.D.N.Y. July 12, 2012); *see also Feliciano v. Anderson*, No. 15-cv-4106, 2017 WL 1189747, at *11 (S.D.N.Y. Mar. 30, 2017) ("Although a delay in providing necessary medical care may in some cases constitute deliberate indifference, [the Second Circuit] has reserved such a classification for cases in which, for example, officials deliberately delayed care as a form of punishment; ignored a 'life-threatening and fast-degenerating' condition for three days; or delayed major surgery for over two years.") (citing *Demata v. N.Y. State Corr. Dep't of Health Servs.*, 198 F.3d 233 (2d Cir. 1999) (unpublished)).

Here, there are several reasons why Mr. Morgan's claim for deliberate indifference to serious medical needs fails. First, there is no dispute that Mr. Morgan received medical treatment less than twenty-four hours after he requested to be seen by the medical department. *See* Morgan Dep. Tr. at 151:10. The record indicates that Mr. Morgan asked for medical attention twice in the evening of February 10, 2014—when being escorted to the dry cell, and again after some time had passed while in the dry cell. Morgan Dep. Tr. at 144:5-15, 147:21-149:2. Mr. Morgan asserted that, while in the dry cell, he showed officers tissues he wiped around his anal cavity that had blood on them. There is no evidence that he otherwise informed officers of any urgent medical need. By the afternoon of the next day, on February 11, 2014, Mr. Morgan was seen by BOP psychologist and a BOP mid-level practitioner. Defs.' 56.1 ¶¶ 46, 51, 53. No reasonable jury could find that this temporary delay in treatment was "needlessly prolonged," or that this short waiting time amounted to a constitutional deprivation of care in light of the symptoms described by Mr. Morgan.

Moreover, there is no evidence in the record that the delay caused "extreme pain" or exacerbated Mr. Morgan's existing pain. The pain was not so severe that it kept him awake in the dry cell; he testified that he fell asleep and when he woke up his condition had improved. *See*

Morgan Dep. Tr. at 151:4-10 ("[B]y the [time I woke up] the bleeding I think kind of slowed down, so I just left it like that."). Mr. Morgan also testified that prior to seeing the mid-level practitioner the afternoon following the search, he was in pain, but that the pain was "a little better" than the day prior, "[m]eaning it wasn't hurting as bad as it was when the incident first happened." Morgan Dep. Tr. at 155:22-156:9. That is, even before receiving medical attention, his condition improved on its own. There is no evidence that Mr. Morgan's conditioned worsened as a result of the time he waited before being seen by the BOP psychologist and BOP mid-level practitioner, and the record therefore does not support a finding that BOP officials were deliberately indifferent to a serious medical need. *See Rodriguez v. City of New York*, 802 F. Supp. 2d 477, 482 (S.D.N.Y. 2011) (granting defendants summary judgment on a claim for deliberate indifference where plaintiff "present[ed] no evidence that his condition worsened as a result of the three-day delay between his request and receipt of medical attention"); *see also Pabon v. Goord*, 99-cv-5869, 2003 WL 1787268, at *11 (S.D.N.Y. Mar. 28, 2003) ("More importantly, there is no evidence that these lapses had any significant impact on the actual care that Plaintiff received, or on his course of treatment.").

Additionally, the medical records of the BOP medical staff who met with Mr. Morgan after the incident do not support a finding that the medical care Plaintiff received was so deficient that it amounted to a constitutional harm. The Sexual Abuse Intervention notes from BOP Chief Psychologist Dr. Miller indicate that he was sent to the Health Services Department "for a complete medical evaluation," and that he would be seen again by a psychologist "in light of this reported incident." Miller Decl., Ex. A (February 11, 2014 Sexual Abuse Intervention Contact Note). After meeting with Dr. Miller, Mr. Morgan was indeed examined by MLP Erwin Ramos. Ramos performed an external examination on Mr. Morgan, and noted that there were "no rectal/anal tears; no bleeding noted on visual exam; no redness or swelling." Ramos Decl., Ex. A (February 11, 2014 Health Services Clinic Encounter Report). Neither medical practitioner commented that Mr.

Morgan required further medical treatment. *See Toliver v. City of New York*, No. 10 CIV. 5806 SHS JCF, 2013 WL 6476791, at *5 (S.D.N.Y. Dec. 10, 2013) ("The minimal treatment that he ultimately received—treatment he does not complain about—leads to the conclusion that his injuries were not serious.") *report and recommendation adopted*, No. 10 CIV. 5806 SHS, 2014 WL 549402 (S.D.N.Y. Feb. 11, 2014).

Furthermore, in addition to being seen by Dr. Miller and MLP Ramos on February 11, 2014, Mr. Morgan was seen by medical staff on numerous occasions following the February 10, 2014 incident: three times by Dr. Miller (February 12, February 20, and March 13); once by a BOP mid-level practitioner on February 15; by an outside clinic on February 28, by a BOP psychiatrist on March 24; and by a BOP physician on March 25. *See* Miller Decl. ¶¶ 5-7, 9 & Exs. B, C, and D; Dkt. No. 219, Beaudouin Decl. ¶¶ 9-14 & Exs. B, C, D, and E. Simply put, there is no evidence in the record to support a claim that there were delays or interruptions in his medical care—indeed, Mr. Morgan was seen by medical professionals multiple times within one week of the search. *See Pabon*, 2003 WL 1787268, at *10 ("The [medical] history recited [] makes it apparent that Plaintiff's condition was not ignored."). Mr. Morgan did not complain of pain or bleeding during any of these visits; there is no evidence to support a finding that Mr. Morgan suffered the type of "life-threatening and fast-degenerating" condition that courts in this Circuit have held to be an adequate basis for a deliberate indifference claim.

Mr. Morgan asserts that the treatment provided by MLP Ramos was inadequate because Ramos "should have [done] an external examination." Morgan Dep. Tr. at 163:6-11. That contention is not sufficient for a reasonable jury to find that the treatment provided amounted to a constitutional harm. "It is well-established that mere disagreement over the proper treatment does not create a constitutional claim. So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation." *Chance v.*

*Armstrong,* 143 F.3d 698, 703 (2d Cir. 1998).  In addition, MLP Ramos' sworn declaration states "[i]nternal examinations were performed only when it was suspected that an inmate possessed contraband; however, the normal practice of the Health Services Department was to not perform internal examinations."  Ramos Decl. ¶ 15.[5]  This further supports the conclusion that the treatment provided to Mr. Morgan did not rise to the level of a constitutional deprivation.  Defendants' motion for summary judgment as to this claim is therefore granted.

### D.  Mr. Morgan's FTCA Claim Predicated on Violation of BOP Policy Fails

Finally, Defendants move for summary judgment with respect to Mr. Morgan's FTCA claim to the extent it is predicated on an alleged violation of BOP policy.  In opposing Defendants' motion for summary judgment, Mr. Morgan rejects the contention that his FTCA claim is based on a violation of BOP policy:  "The Plaintiff is not forming the basis of his FTCA claim on the regulations propagated by the BOP.  The basis of the Plaintiff's claim is the state law assault perpetrated upon him by defendants . . ."  Pl's. Opp'n at 21.  Nevertheless, in the interest of completeness, the Court addresses Defendants' argument here.

The FTCA waives sovereign immunity of the United States against claims for property damage or person injury "caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."  28 U.S.C. § 1346(b)(1); *see also* 28 U.S.C. § 2674.  As such, a plaintiff's cause of action under the FTCA must be comparable to a cause of action that is recognized in the jurisdiction where the tort took place.  "'This 'private analogue'

---

[5] The Court notes the irony in Mr. Morgan's contention that an internal examination would have been appropriate in these circumstances, given that such an examination "would have required [MLP Ramos] to insert a finger or instrument into Mr. Morgan's anal cavity."  Ramos Decl. ¶ 15.

requirement asks 'whether a private person would be responsible for similar negligence under the laws of the State where the acts occurred.'" *McGowan v. United States*, 825 F.3d 118, 125 (2d Cir. 2016) (quoting *Dorking Genetics v. United States*, 76 F.3d 1261, 1266 (2d Cir. 1996)).

Defendants read Mr. Morgan's SF-95 Form to state that his claim is based on Officer Graham "illegally and in defiance of B.O.P. policy, . . . repeatedly forc[ing] his fingers into [Plaintiff's] rectum, while other officers restrained [Plaintiff], in an effort to retrieve the suspected contraband." *See* Defs.' 56.1 ¶¶ 74-75. To the extent the violation of BOP policy, standing alone, is the "private analogue" for Mr. Morgan FTCA claim, that claim fails. The Second Circuit has evaluated FTCA claims that purport to be based on a government official's failure to abide by federal regulations, and has held that a "violation of the government's duties under federal procurement regulations is action of the type that private persons could not engage in and hence could not be liable for under local law.'" *McGowan*, 825 F.3d at 127 (quoting *Chen v. United States*, 854 F.2d 622, 626 (2d Cir. 1988) (internal quotation marks omitted). In *McGowan*, the Second Circuit further held that there is no "freestanding duty to abide by private regulations" under New York law. *Id.* Lacking a private analogue under New York law, Mr. Morgan cannot bring his FTCA claim on the basis of the officers' violation of BOP regulations. To the extent he does so, his claim fails as a matter of law, and Defendants' are therefore entitled to summary judgment on that claim.

## VI. CONCLUSION

Because Mr. Morgan has alternative remedies available to him, and because there are special factors counseling hesitation in extending *Bivens* to the context raised in this case, Defendants are entitled to summary judgment on Mr. Morgan's Fourth and Fifth Amendment claims. In addition, because the record does not show that Mr. Morgan suffered a "sufficiently serious" delay or harm, Defendants are entitled to summary judgment on his Fifth Amendment deliberate indifference claim. Finally, to the extent Mr. Morgan's FTCA claim is predicated on a violation of BOP policy,

that claim fails as a matter of law because there is no private analogue for a violation of BOP policy

under New York law.  Defendants' motion for partial summary judgment is therefore granted.

The Clerk of Court is directed to terminate the motion pending at Dkt. No. 211.

Chambers will mail Plaintiff a copy of this order together with copies of any unpublished

cases cited in this opinion.

SO ORDERED.

Dated: January 29, 2018
      New York, New York

_____
GREGORY H. WOODS
United States District Judge